IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTPOHER STREBEL and TRACY HENNING, ) ) ) | |
| Plaintiffs, ) ) | No. 24 C 968 |
| v. ) ) | Judge Robert W. Gettleman |
| SCOULAR, f/k/a THE SCOULAR COMPANY, INC. ) ) ) ) | |
| Defendant. ) | |

## **MEMORANDUM OPINION & ORDER**

Plaintiffs Christopher Strebel ("Strebel") and Tracy Henning ("Henning") (collectively, "plaintiffs") brought a four-count second amended complaint against defendant Scoular, f/k/a the Scoular Company, Inc. ("defendant"). Count I alleges a citizen's suit under § 7604(a)(1) of the Clean Air Act ("CAA"), 42 U.S.C. § 7604(a)(1); Count II alleges a citizen's suit under the § 7604(a)(3) of the CAA, 42 U.S.C. § 7604(a)(3); Count III alleges private nuisance; and Count IV alleges negligence.  This court previously granted defendant's motion to dismiss Count II (Doc. 35).  Before the court are plaintiffs' motion to reconsider that ruling (Doc. 36), plaintiffs' motion to strike affirmative defenses (Doc. 41), and plaintiffs' motion to dismiss counterclaims (Doc. 42).  For the reasons discussed below, plaintiffs' motion to reconsider is denied, plaintiffs' motion to strike affirmative defenses is granted in part and denied in part, and plaintiffs' motion to dismiss counterclaims is granted in part and denied in part.

## **BACKGROUND**

According to the factual allegations in plaintiffs' second amended complaint, plaintiffs

1

seek injunctive relief and damages arising from allegedly unabated fugitive grain dust emissions from defendant's grain-handling facility in Andres, Illinois, which they complain is polluting the neighboring property owned by Strebel for over 20 years. Both plaintiffs state that they live at the property (a single-family home and land).

Plaintiffs allege that from 1913 through February 27, 2013, the Andres & Wilton Farmers Grain and Supply Company ("Andres & Wilton") operated a grain elevator (the "Andres Facility"). They state that on July 16, 2012, the United States Environmental Protection Agency ("USEPA") conducted an unannounced inspection of the Andres Facility, and on August 17, 2012, issued a Notice and Finding of Violation, EPA-5-12-IL-14 (NOV) to Andres & Wilton regarding violations at the facility, including, among other things, that Andres & Wilton was operating the Andres Facility without necessary permits and in violation of the Illinois State Implementation Plan ("SIP") for the CAA.

On September 5, 2012, plaintiffs allege that the USEPA issued a report on its inspection, stating that the USEPA found: loose grains scattered on the facility's yard; dusty dirt and gravel driveways; dump pits without induced draft and open doors while grains were dumped; visible emissions while trucks were unloading; lack of air pollution controls on the internal transferring area; sleeves or equivalent devices not extended into trucks being loading; and visible emissions while trucks were being loaded. The USEPA allegedly issued a Notice of Intent to File a Civil and Administrative Complaint to Prior Owner on December 6, 2012.

According to plaintiffs, Andres & Wilton filed a permit application with the Illinois Environmental Protection Agency ("IEPA") on September 28, 2012, and the IEPA issued a Joint Construction and Revised Operating Permit on December 11, 2012. Plaintiffs allege that defendant purchased the Andres Facility on or about February 27, 2013, and on April 10, 2013,

the name on the IEPA-issued permit was changed from Andres & Wilton to defendant.

Plaintiffs then allege that the IEPA issued a Revised Joint Construction and Revised Operating Permit for the Andres Facility on or about October 30, 2013, which included a dump pit modification to allow construction of "baghouse control" and the operation of emissions sources and/or air pollution control equipment, including "Truck Loadout with Socks/Sleeves" and "Grain Storage Bins" for one year.

Plaintiffs further allege that on or about March 19, 2014, defendant entered into an Administrative Consent Order ("the Consent Order") with USEPA. According to plaintiffs, the Consent Order required defendant to submit construction and operating permits, and to agree to immediately implement compliance measures. Plaintiffs allege that on or about October 9, 2014, the IEPA issued a revised permit to allow defendant, among other things, to construct new cleaning and sorting equipment for one year. The IEPA allegedly further revised the permit on or about December 3, 2015, to allow defendant to again construct new cleaning and sorting equipment for one year. Plaintiffs allege that each of the permits state in paragraph 2a that:

> "No person shall cause or allow the emission of fugitive particulate matter from any process, including any material handling or storage activity that is visible by an observer looking generally toward the zenith (that is, looking at the sky directly overhead) from a point beyond the property line of the emission source, pursuant to 35 Ill. Adm. Code 212.301, except as exempted by 35 Ill. Adm. Code 212.314."

According to plaintiffs, after defendant acquired the Andres Facility, it substantially increased both the storage capacity and "throughput" of grain received, processed, and shipped through the facility. Plaintiffs allege that the facility operates within 100 feet of Strebel's property, and since it began its operations, defendant has "caused fugitive dust and grain emissions to fall onto and cover the Property with grain particulates." Moreover, plaintiffs allege that upon information and belief, defendant has operated without a valid operating permit since

3

December 3, 2016, and has made modifications to the Andres Facility without an effective construction permit.

Plaintiffs complain that Strebel emailed to defendant pictures taken from his property of defendant's "illegal emissions and the impact on the Property." Plaintiffs further complain that they called the USEPA, which directed them to contact the IEPA. Plaintiffs allege that they then "caused videos and pictures . . . to be forwarded to the IEPA," and on or around May 20, 2022, the IEPA directed plaintiffs to fill out a visible emissions log to submit to the IEPA, which they submitted on September 12, 2022.

According to plaintiffs, on September 19, 2022, plaintiffs notified the IEPA of "unbelievable amounts of grain dust" being emitted from operations at the Andres Facility and attached a picture and videos of grain dust. Plaintiffs allege that defendant's operation of the Andres Facility has caused "excessive fugitive grain dust to be emitted and to fall onto the Property." Plaintiffs state that the fugitive dust and grain emissions have "caused physical distress and injury to Plaintiffs and to [the] Property, including causing even his horses to become sick," and Henning "in particular has suffered severe and permanent injuries as a result of exposure to toxic grain dust."[1] Plaintiffs allege that they "caused written notice to be provided to the USEPA, IEPA, and Illinois Attorney General" regarding alleged violations of the CAA on September 26, 2023.

Plaintiffs also allege that on February 25, 2023, the IEPA issued a construction permit to defendant with respect to construction of air pollution control equipment regarding a soy

---

[1] In Exhibit G (which is incorporated by reference into the complaint), plaintiffs' counsel state that "grain dust has trespassed onto [plaintiffs'] property and caused them property damage, costs, personal injury and injury to their animals. In particular, Ms. Hennings had developed a form of environmentally-triggered lupus, has suffered painful lung irritation and suffered a permanent injury to her eyes as a result of excessive and persistent fugitive grain dust exposure."

4

dehulling process. Plaintiffs allege that on January 30, 2024, defendant operated its facility in violation of the permit requirement by allowing the emission visible dust clouds from its operations, and that this construction permit has expired and has not been renewed.

Defendant filed a motion to dismiss (Doc. 27) that this court granted with regard to Count II and denied on all other counts (Doc. 35).[2] After that ruling, defendant then filed an answer to plaintiffs' second amended complaint which included nine affirmative defenses and two counterclaims. The affirmative defenses are as follows: (1) coming to the nuisance; (2) failure of plaintiffs to mitigate injuries and damages; (3) failure to state a claim; (4) various equitable claims; (5) compliance with all permits, statutes, and laws; (6) statute of limitations; (7) exercise of reasonable care; (8) lack of notice in violation of 42 U.S.C. § 7604(b); and (9) that plaintiffs' claim is barred under the Illinois Farm Nuisance Suit Act, 740 ILCS 70/3. Counterclaim I alleges trespass and Counterclaim II is an action to quiet title.

## DISCUSSION

This memorandum and order will dispense with three separate motions: a motion to reconsider, a motion to strike affirmative defenses, and a motion to dismiss counterclaims. While these three motions all concern the same factual and legal background covered above, the three motions will be discussed separately below for the sake of clarity.

### Motion to Reconsider

As Judge Shadur once wrote: "this Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure." Quaker Alloy Casting Co. v.

---

[2] Strebel v. Scoular, No. 24-cv-00968, 2024 WL 3888798 (Aug. 21, 2024, N.D. Ill.).

Gulfco Industries, Inc., 123 F.R.D. 282, 288 (N.D. Ill. 1988). Although motions to reconsider are generally disfavored, they can be appropriate in certain circumstances. One such set of appropriate circumstances is when there has been "a controlling or significant change in the law…since the submission of the issue to the court." Bank of Waunakee v. Rochester Cheese Sales, Inc., 906 F.2d 1185, 1192 (7th Cir. 1990).[3]

Plaintiffs argue that the court should reconsider its order granting dismissal of Count II of the second amended complaint in light of the Supreme Court's recent ruling in Loper Bright Enterprises v. Raimondo, 144 S.Ct. 2244 (2024). In Loper Bright, the Court overruled Chevron v. Natural Resources Defense Council, 467 U.S. 837 (1984), a case that until recently guided federal courts' approach to statutory interpretation in administrative law. Plaintiffs' argument proceeds through a few steps to connect this court's order to the Supreme Court's decision in Loper Bright. First, this court's order relied on McEvoy v. IEI Barge Services, Inc., 622 F.3d 671 (7th Cir. 2010). Second, in McEvoy, although the Seventh Circuit did not cite Chevron explicitly, its decision to deem the Visible Dust Regulation judicially unenforceable was an application of Chevron principles, in that the court was following the broad rule of judicial deference to agency interpretation in the face of ambiguity. And third, since Loper Bright overruled Chevron, it implicitly overruled the McEvoy. Thus, plaintiffs argue, the court should reconsider its order in response to a change in the governing law, which occurred after the relevant briefing was completed.

Defendant, in response, argues that the Supreme Court's decision in Loper Bright is entirely unrelated to McEvoy. Defendant points out that McEvoy cites neither Chevron nor the

---

[3] While the discrepancies in plaintiffs' motion to reconsider (Doc. 36) are not substantive or misleading, the court reminds litigants of the importance of accurately quoting authorities in their filings before the court. See Fed. R. Civ. P Rule 11(b).

Administrative Procedure Act, the statute at issue in Loper Bright. Defendant also points out that McEvoy involved no agency action. Defendant also argues that Loper Bright, by its own terms, does "not call into question prior cases that relied on Chevron framework" and held that "[m]ere reliance on Chevron cannot constitute a 'special justification' for overruling such a holding." 144 S.Ct. at 2273.

The court disagrees with plaintiffs. Chevron and Loper Bright are cases about how courts should interpret federal statutes in the face of ambiguity. Chevron commanded courts to defer to federal agency interpretations in the face of uncertainty, and Loper Bright now instructs courts to construe ambiguous federal statutes without requiring any deference to federal agency interpretation. The Visible Dust Regulation at issue here and in McEvoy involves neither a federal statute nor a federal agency interpretation. Plaintiffs' misunderstanding of these fundamental premises renders the remainder of their argument largely meaningless.

Although neither party briefed the issue, there was indeed a federal statute at issue in McEvoy: the CAA. In McEvoy, the ultimate statutory question that the Seventh Circuit answered was whether the Illinois Visible Dust Regulation qualifies as an "emission limitation" or "emission standard" under 42 U.S.C. §7602(k) that can support a citizen suit under 42 U.S.C. §7604(f)(4). See McEvoy, 622 F.3d at 675 (explaining that "[t]heir argument on appeal can thus be boiled down to the proposition that the Illinois provisions constitute 'emission standards' or 'emission limitations' under § 7602(k)."). In ruling that the Visible Dust Regulation is not judicially enforceable, the Seventh Circuit decided that, as a matter of statutory interpretation, the Illinois Visible Dust Regulation was not an emission standard or limitation that, if violated, could form the basis for a citizen suit under the CAA. Thus, the Seventh Circuit in fact did exactly what plaintiffs accuse it of failing to do: it interpreted the statute. Or, to use plaintiffs'

preferred language from Marbury v. Madison, the Seventh Circuit fulfilled its "province and duty…to say what the law is." 5 U.S. 137, 177 (1803). [4] The Seventh Circuit interpreted the statute with no deference paid to any federal agency interpretation, because, once again, there was no agency interpretation, federal or otherwise, at issue. Thus, far from impliedly overruling McEvoy, the Supreme Court's decision in Loper Bright endorses the Seventh Circuit's decision in McEvoy, where the court did "not defer to an agency interpretation of the law simply because a statute is ambiguous" and instead resolved the ambiguity in the CAA "by exercising independent legal judgment." Loper Bright, 144 S.Ct. at 2273, 2266. Consequently, plaintiffs' motion to reconsider (Doc. 36) is denied.

## Motion to Strike Affirmative Defenses

Rule 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. Pro. 12(f). Courts strike affirmative defenses when they are insufficient on their face. See Heller Fin., Inc. v. Midwhey Powder Co., 883 F.2d 1286, 1294 (7th Cir. 1989). Motions to strike are appropriate to "remove unnecessary clutter from the case," but they are generally disfavored in this circuit because they are often employed for the sole purpose of causing delay. Id.

The Seventh Circuit has not yet decided whether affirmative defenses must comply with the pleading requirements set forth in Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009). The district courts within the circuit are divided on this

---

[4] Plaintiffs appear to argue that this court should reconsider its decision that relies on the Seventh Circuit's holding in McEvoy due to the command of Marbury v. Madsion that it is the "province and duty of the judicial department to say what the law is." 5 U.S. 137, 177 (1803). Suffice it to say that Marbury is close to as far away from "a controlling or significant change in the law…since the submission of the issue to the court" as one can get. Bank of Waunakee, 906 F.2d at 1192 (7th Cir. 1990).

issue. See Cottle v. Falcon Holdings Mgmt., LLC, No. 2:11-CV-95-PRC, 2012 WL 266968, *1–2 (N.D. Ind. Jan. 30, 2012) (collecting cases). This court agrees generally with the courts that have declined to apply the plausibility standard to affirmative defenses, for the reasons set forth in Judge Seeger's comprehensive and well-reasoned opinion in Alyin & Ramtin, LLC v. Barnhardt, No. 19-CV-3402, 2022 WL 658786 (N.D. Ill. Mar. 4, 2022). Thus, "an affirmative defense may be pleaded in general terms and will be held to be sufficient, and therefore invulnerable to a motion to strike, as long as it gives the plaintiff fair notice of the nature of the defense." Id. at *2 (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1274 (4th ed. 2021)).

**First Affirmative Defense: Coming to the nuisance**

Defendant argues that "[a]ll or part of Plaintiffs Christopher Strebel and/or Tracy Henning's private nuisance claim asserted against Scoular herein may be barred by the common law defense of 'coming to the nuisance.'" Plaintiffs, citing Oehler v. Levy, 234 Ill. 595 (1908), argue that the common law defense of common to the nuisance has been abandoned in Illinois law for over 100 years. Defendants argue that the "coming to the nuisance" defense is still alive in Illinois law because the Illinois Farm Nuisance Suit Act (740 ILCS 70/1 et seq.) codifies the coming to the nuisance doctrine. The court grants plaintiffs' motion to strike. Even if defendant is correct that the Illinois Farm Nuisance Suit Act (740 ILCS 70/1 et seq.) codifies the coming to the nuisance doctrine (with exceptions), that defense is consequently a statutory, and not a common law, defense. See Guth v. Tazewell County, 698 F.3d 580, 584 (7th Cir. 2012). Consequently, the court grants plaintiffs' motion to strike the first affirmative defense.

9

**Fourth Affirmative Defense: Equitable doctrines**

The entirety of defendant's fourth defense is as follows: "Plaintiffs' equitable claims alleged herein may be barred, in whole or in part, by the equitable doctrines of estoppel, laches, waiver, and/or unclean hands." While these defenses are affirmative defenses listed in Rule 8(c)(1), defendant fails to give plaintiffs "fair notice of the nature of the defense." Alyin & Ramtin, 2022 WL 658786, at *2. First, defendant does not identify which of the listed defenses it intends to invoke. Second, defendant pleads only that these defenses "may" bar plaintiffs' equitable claims "in whole or part." Third, while this court does not require defendant to plead factual content that meets the Twombly-Iqbal plausibility standard, defendant's boilerplate pleading is so devoid of factual context that plaintiffs cannot begin to understand the nature of the defenses. See Consumer Financial Protection Bureau v. TransUnion, 701 F.Supp.3d 744, 752 (N.D. Ill. 2023) (striking similarly pled equitable defenses because they "fail under even a fair notice standard."). Because these defenses fail to give plaintiffs fair notice, the court grants plaintiffs' motion to strike the fourth affirmative defense.

**Fifth Affirmative Defense: Compliance with all permits, statutes and law**

The entirety of defendant's fifth affirmative defense is as follows: "In regard to Plaintiffs' allegations against Scoular, Scoular and its Andres Facility have operated in compliance with terms and limitations issued permits, applicable statutes and law, which would bar Plaintiffs' claims under the CAA and negligence." Plaintiffs ask the court to strike this defense on the basis of pleading insufficiencies, because plaintiffs contend that this defense is just a matter put into issue by a denial of allegations in Count I, and the merits. Defendant responds that the defense is more than just a matter put into issue by denial but rather constitutes a greater defense to all of

10

plaintiffs' claims. Defendant also urges the court not to strike the defense on the merits as "determining the merits of this defense goes to the very heart of at least part of plaintiffs' case: whether Scoular violated the CAA."

The court agrees with defendants that this defense is more than a matter put into issue by denial, as it could serve as a defense to claims beyond plaintiffs' CAA claim in Count I, such as plaintiffs' nuisance and negligence claims. In addition, the court finds that plaintiffs primarily argue against the merits of the defense, raising substantial questions of law that are better decided after factual development. Thus, the court denies plaintiffs' motion to strike defendants' fifth affirmative defense.

**Seventh Affirmative Defense: Exercise of reasonable care**

The entirety of defendant's seventh affirmative defense is as follows: "At all times relevant to the case at hand, Scoular has exercised reasonable care in the construction and operation of the Andres Facility." Plaintiffs argue that "reasonable care" is not available as an affirmative defense as to the violations of the CAA alleged in Count I because it is not provided for in the statute. As to Count III for private nuisance, plaintiffs argue that reasonable care is not relevant to the law of nuisance. What remains of the seventh affirmative defense, plaintiffs argue, is a negation of the necessary element of breach of duty in Count IV for negligence. Defendant responds that the exercise of reasonable care is relevant to a potential penalty determination if the court later finds defendant liable for violation of the CAA.

The court agrees with plaintiffs. The exercise of reasonable care is not available as an affirmative defense for liability under the CAA. Defendant concedes as much. While defendant is correct that its "good faith efforts to comply" will be taken into consideration at the penalty

11

phase, that is an argument that defendant can make at that time if it comes. See 42 U.S.C. § 7413(e).[5] As plaintiffs argue, reasonable care is not relevant to liability under a nuisance claim. See Richards v. Village of Edinburg, 239 N.E.2d 479, 481 (Ill. App. 5th 1968). (explaining that "a nuisance may be created or maintained with the best or highest degree of care."). Defendant did not attempt to respond to this argument, nor plaintiffs' argument that exercise of reasonable care is simply a denial of the breach element of negligence under Illinois law. See Kellermann v. Car City of Chevrolet-Nissan, Inc., 713 N.E.2d 1285, 1287 (Ill. App. 1st 1999) (explaining that "[i]n a negligence action, one of the essential elements is the existence of a duty to exercise reasonable care."). By arguing that it exercised reasonable care, defendant is simply arguing that it did not breach its duty to do so. As defendant's seventh affirmative defense is facially insufficient as a matter of law, the court grants plaintiffs' motion to strike it.

**Ninth Affirmative Defense: Farm Nuisance Suit Act**

Defendant's ninth affirmative defense is as follows: "Plaintiffs' private nuisance claim is barred under the Illinois Farm Nuisance Suit Act, 740 ILCS 70/3." Plaintiffs argue that this affirmative defense should be stricken because defendant does not operate a "farm" as defined in section two of the Illinois Farm Nuisance Suit Act because its activities on the land qualify as a "agriculture adjacent" rather than "agricultural use" under the act.[6] Without reaching the substance of defendant's response, the court finds that plaintiffs are asking the court to adjudge defendant's ninth affirmative defense on the merits, which the court declines to do at this stage before further factual development.

---

[5] Both parties erroneously cited to 42 U.S.C. § 7613(e) instead of 42 U.S.C. § 7413(e).
[6] As this court has declined to apply the plausibility standard to affirmative defenses, plaintiffs' argument that defendant's ninth affirmative defense should be struck because of factual insufficiency is not considered by the court.

**Motion to Dismiss Counter Claims**

Defendant included two counterclaims in its answer to plaintiffs' second amended complaint. Count I, trespass, alleges that, "Plaintiffs intentionally entered the Scoular Property to construct, or cause to be constructed" "three sheds that are partially or fully located on the Scoular Property." Count II, quiet title, alleges that, "Plaintiffs' construction and maintenance of [the three sheds] on Scoular's Property creates a dispute as to the ownership of the property upon which Plaintiffs constructed and maintain [the three sheds], a false semblance of title to the Scoular Property, and/or a cloud upon Scoular's title to the Scoular Property."

Plaintiffs argue that the court should dismiss both counterclaims because it lacks supplemental jurisdiction over them, or, alternatively, that the court should use its discretion to decline to exercise supplemental jurisdiction over these counterclaims. Defendant argues that the court is permitted to exercise supplemental jurisdiction over the counterclaims and should exercise its discretion to do so.

As plaintiffs ask the court to dismiss defendant's counterclaims for lack of jurisdiction, the court will evaluate the motion under the standards for Rule 12(b)(1), even though the plaintiffs do not categorize their motion as such. The Seventh Circuit has held that "when evaluating a facial challenge to subject matter jurisdiction under Rule 12(b)(1), a court should use Twombly–Iqbal's 'plausibility' requirement, which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6)." Silha v. ACT, Inc., 807 F.3d 169, 174 (7th Cir. 2015). When reviewing a motion to dismiss, this court "must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." Id. at 173. A plaintiff, here cross-plaintiff, faced with a 12(b)(1) motion to dismiss bears the burden of establishing that the jurisdictional requirements have been met. Center for Dermatology and

Skin Cancer, Ltd. v. Burwell, 770 F.3d 586, 589 (7th Cir. 2014).

Supplemental jurisdiction is authorized by Congress under 28 U.S.C. § 1367(a). "The statute confers supplemental jurisdiction to the limits Article III of the Constitution permits, authorizing federal courts to hear all claims that 'are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.'" Ammerman v. Sween, 54 F.3d 423, 424 (7th Cir. 1995) (quoting 28 U.S.C. § 1367(a)). Accordingly, "[t]wo claims are part of the same case or controversy if they derive from a common nucleus of operative facts." Sanchez & Daniles v. Koresko, 503 F.3d 610, 614 (7th Cir. 2007) (internal quotations and citations omitted). While "a loose factual connection between the claims is generally sufficient," "the facts connecting them must nonetheless be operative in determining the outcome of the federal claim." Mata v. Deslauriers, Inc., No 21-CV-3976, 2023 WL 6065478, at *1 (N.D. Ill. Sep. 18, 2023). See also General Auto Service Station v. City of Chicago, No. 00-C-0368, 2004 WL 442636, at *12 (N.D. Ill. Mar. 9, 2004) (denying supplemental jurisdiction where the outcomes of the supplemental claim and original claim would have no mutual effect); Saud v. DePaul University, No. 19-CV-3945, 2019 WL 5577239, at *8 (N.D. Ill. Oct. 29, 2019) (denying supplemental jurisdiction where "none of the facts necessary to resolution of the state law claims are more than tangentially related to sole remaining federal claim"). "To be 'operative' the facts must be 'relevant to the resolution of' the federal claims." Mata v. Deslauriers, Inc., 2023 WL 6065478, at *1 (quoting United States v. Clark, No. 08-C-4158, 2010 WL 476637, at * 1 (N.D. Ill. 2010)).

Even if the court determines that it is authorized to exercise supplemental jurisdiction, it is not bound to do so. A court is permitted to decline to exercise supplemental jurisdiction if "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates

14

over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. §1367(c). With those principles in mind, the court will first analyze whether it is authorized to exercise supplemental jurisdiction, and, if so, will next analyze whether there are reasons for the court to decline to do so.

The first issue is whether the court has supplemental jurisdiction over defendant's state law counter claims. The decisive determinant of this issue is whether the state law counter claims arise from a common nucleus of operative fact as the claims over which the court already has subject matter jurisdiction. Plaintiffs argue that the "sole connective tissue between Plaintiffs' claims and Scoular's counterclaims is the identity of the parties." According to plaintiffs, none of their claims will rise and fall based on the outcome of defendant's property line counterclaims. In response, defendant correctly identifies the source of this court's original subject matter jurisdiction over plaintiffs' claims—diversity jurisdiction over the three remaining counts and federal question jurisdiction over the CAA claim in Count I—and that the court will look to all three of these claims to determine whether they share the same nucleus of operative fact with defendant's counterclaims. Defendant argues that its property-line related counterclaims are derived from the same nucleus of operative facts as the common law nuisance claim, because a prospective private nuisance claim must allege a property interest under threat of invasion.

The court disagrees with the defendant. The outcome of defendant's trespass and quiet title counterclaims will have no bearing on the outcome of plaintiffs' CAA claim (Count I), nuisance claim (Count III), or negligence claim (Count IV). Section 7604(a) of the CAA

authorizes private citizens to bring "citizens suits" in federal court against "any person … who is alleged to have violated … or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation." 42 U.S.C. § 7604(a)(1). The statute governing plaintiffs' ability to bring a citizen suit does not require property ownership.

Defendant is correct that to support the nuisance claim, plaintiffs must allege a property interest under threat of invasion. But even if defendant is fully vindicated on its counterclaims, plaintiffs still possess a property that they allege has been invaded by fugitive grain dust emissions. Neither of defendant's counterclaims allege that defendant owns the entirety or even a substantial portion of the plaintiffs' property, which includes the single-family home that they reside in. Instead, defendant's counterclaim disputes the location of three sheds. Therefore, plaintiffs' nuisance action will rise and fall regardless of the outcome of defendant's trespass and quiet title actions.

In briefing, defendant does not attempt to argue that plaintiffs' negligence claim shares a common nucleus of operative fact with its counterclaims. For the sake of completeness, the court notes that there is no relationship between the operative facts of defendant's counterclaims and plaintiffs' negligence claim. Like the nuisance claim, the negligence claim does require a foundational factual showing that defendant owned some property, because plaintiffs allege that defendant "breached its duty of care towards Plaintiffs by failing to prevent substantial pollution onto Plaintiffs' property." And like the nuisance claim, plaintiffs' ability to make this showing will not be affected by the outcome of either of defendant's counterclaims. Even if defendant's quiet title and trespass counterclaims regarding the location of the three sheds are completely vindicated, there is no dispute that plaintiffs own a property, including a single-family residence,

16

adjacent to the Andres Facility.

All three of the remaining counts in plaintiffs' second amended complaint, the remaining CAA citizen suit claim, the nuisance claim, and the negligence claim, will rise and fall regardless of the outcome of defendant's trespass and quiet title counterclaims. The converse is also true. Defendant's quiet title and trespass claims will rise and fall regardless of the outcome of plaintiffs' three claims. Therefore, defendant's counterclaims and plaintiff's claims do not share a common nucleus of operative facts, because the facts connecting them are not operative; the facts shared between the two sets of claims are not relevant to the resolution of any claim in either of the two sets. See Mata, 2023 WL 6065478, at * 1; General Auto Service, 2004 WL 442636, at *12; Saud v. DePaul University, 2019 WL 557723, at *8. Ultimately, defendant's counterclaims are not "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.'" Ammerman, 54 F.3d at 424. Consequently, the court grants plaintiffs' motion to dismiss the counterclaims.

## CONCLUSION

For the reasons stated above, plaintiffs' motion to reconsider (Doc. 36) is denied; plaintiffs' motion to strike affirmative defenses (Doc. 41) is granted in part with respect to defendant's first and seventh affirmative defenses and denied with respect to all other affirmative defenses; and plaintiffs' motion to dismiss counterclaims (Doc. 42) is granted without prejudice.

ENTER:

**Robert W. Gettleman**
**United States District Judge**

**DATE: November 27, 2024**

17